IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLENE LARSON, | ) |
| | ) |
| Plaintiff | ) No. 04 C 7305 |
| | ) |
| v. | ) The Honorable William J. Hibbler |
| | ) |
| ENDODONTIC & PERIODONTIC ASSOC., LTD, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Kathlene Larson sued her former employer, Endodontic & Periodontic Associates (E&P), alleging that it interfered with her rights under the Family Medical Leave Act and that it retaliated against her for asserting her rights under the FMLA. E & P moves for summary judgment.

### I. Factual Background[1]

E&P provides endodontic and periodontic dental services, with six offices scattered in the suburbs of Chicago, Illinois. (Moore Dep. at 8-9). E&P employs three clinical positions: hygiene assistant, rover, and chairside assistant. (Zweifler Dep. at 7). Normally, E&P begins its clinical employees in the position of hygiene assistants and they later train, successively, to become rovers and chairside assistants. (Zweifler Dep. at 8).

Larson began working at E&P in August 2002, as a chairside assistant for Dr. John Moore. (Pl. 56.1 St., Ex. A; Moore Dep. at 12, 17). E&P hired Larson as a chairside assistant because she

---

[1] Both parties move to strike portions of the others' 56.1 statements. The Court has fully reviewed the parties 56.1 statements, and while certain paragraphs sometimes rely on hearsay or unauthenticated documents, neither submission is so egregious that the Court need list the deficiencies in the materials. Instead, it relies only on properly supported statements of fact. The motions to strike are DENIED.

1

had prior experience as a dental assistant and because Moore's prior chairside assistant had to leave abruptly. (Zweifler Dep. at 8). Unlike other chairside assistants at E&P's offices, Larson did not have a trained back-up who could substitute for her if she were absent. (Larson Dep. at 103).

In early August 2003, Larson suffered an accident while working as Moore's chairside assistant. (Larson Dep. at 28-29; Moore Dep. at 51). The next day, Larson had severe back pain and made an emergency appointment with her physician, Dr. Mayorga. (Pl. St., Ex. K; Larson Dep. at 22-23). Later in the month, Larson informed E&P that she would be unable to work while she recovered from her injury and that she required a surgical procedure to address her back pain. (Moore Dep. at 48-50; Larson Dep. at 18-19, 25). During her time away from work, Larson remained in contact with Moore to let him know of her progress. (Larson Dep. at 28-29). On August 13, E&P received a fax informing it that Larson would be unable to work for another two weeks. (Moore Dep. at 66). Despite receiving this fax, E&P recorded Larson as having provided "short notice" for her August 2003 leave. (Moore Dep. at 66-67). Larson returned to work on August 26. (Moore Dep. at 66-67).

In late September, Dr. Mayorga referred Larson to an endocrinologist because a CAT scan had revealed a multi-nodular goiter, a condition characterized by thyroid hyperactivity. (Mayorga Dep. at 8-9, Bayrakdar Dep. at 7). The endocrinologist, Dr. Bayrakdar, diagnosed Larson as suffering from hypothyroidism and a toxic multi-nodular goiter (MNG). (Bayrakdar Dep. at 7). He prescribed Larson several medications to address her thyroid condition. (Bayrakdar Dep. at 7-8). Dr. Bayrakdar also discussed other treatment options with Larson, including radiation treatment and surgery. (Bayrakdar Dep. at 11-12). Although Dr. Bayrakdar did not diagnose Larson with Grave's disease, he testified that Grave's disease differs from MNG in that with Grave's disease the entire

thyroid is overactive, whereas with MNG, only part of the thyroid are overactive. (Bayrakdar Dep. at 11-12). Dr. Bayrakdar also testified that the potential courses of treatment are similar for both Grave's disease and MNG . (Bayrakdar Dep. at 10-11). Larson understood that if she underwent the radiation treatment it would necessitate taking three to six weeks off work. At that time, however, some aspect of her physiology prevented her from commencing the treatment. (Larson Dep. at 49, 101).

Shortly after Larson visited Dr. Bayrakdar, Moore gave Larson her first performance evaluation in October 2003. (Pl. St., Ex. I; Moore Dep. at 20-22). On a 1-10 scale, with 10 being the high score, Moore rated Larson between 7-9 in every category, with a total score of 80 in ten categories. (Pl. St., Ex. I; Moore Dep. at 20-22). Moore characterized Larson's evaluation as "fairly good." (Moore Dep. at 22). In a separate space on the evaluation for comments, Moore noted under "strengths" that Larson was intelligent, hard working, adapts well to changes in schedule, was efficient and organized, does her job duties quickly, and gets along with staff members and patients. (Pl. St., Ex. I). In the same section, Moore noted under "improvements" that "[a]ttendance and being on time are critical areas of concern for a chairside," "[a]lways treat the patients with compassion and patience," and that "[a]lthough improved . . . [there are] still . . . occasions where [he is] waiting or looking for [his] assistant." (Pl. St., Ex. I). Although Moore noted that Kathy's attendance was an issue during her evaluation, he did not have another discussion with her about her attendance for the remainder of 2003. (Moore Dep. at 63-64). On January 30, 2004, Moore had a discussion with Larson about providing adequate notice if she were to be absent. (Moore Dep. at 63-65). However, despite the fact that E&P had a policy that stated that employees with unsatisfactory attendance must be formally warned in writing about their attendance, Larson never received any formal disciplinary

3

warnings regarding her attendance or her tardiness. (Def. St., Ex. 6; Zweifler Dep. at 11-13, 17; Moore Dep. at 43).

Around the same time as her performance evaluation and her initial visit to Dr. Bayrakdar, Larson informed Moore that she had Grave's disease.[2] According to Larson, during the course of the next six months, she spoke to Moore about her thyroid condition twelve to fifteen times. (Larson Dep. at 50-52). Further, Larson also testified that she discussed with Moore the potential impact of radiation treatment upon her schedule approximately five to seven times. (Larson Dep. at 52-53).[3] Late in April just before her termination, Larson again spoke with Moore, this time behind closed doors, about her potential radiation treatment and her potential need for time off. (Larson Dep. at 53).

In early April 2004, David Zweifler, E&P's Practice Administrator, called Larson at home to inform her that she was being reassigned from the position of Moore's chairside assistant to the position of hygiene assistant. (Zweifler Dep. at 58-59). Moore, who had requested the change, characterized Larson's reassignment as a demotion. (Zweifler Dep. at 58; Pl. Ex. D). Moore noted that one reason why he requested the change was because he found it difficult to accommodate

---

[2] Although it is undisputed that Larson has MNG and not Grave's disease, it is also undisputed that when she informed Moore of her thyroid condition, she informed him that she suffered from Grave's disease.

[3] Defendant denies the frequency of conversations between Larson and Moore, pointing to Moore's deposition in support. But on a motion for summary judgment, the Court must accept the non-moving party's version of the facts, provided the non-moving party as directed the Court to the portion of the record that supports its version. Regardless, Defendant does not dispute that Larson and Moore had some discussions regarding her thyroid condition and her potential need to take three to six weeks sick leave during the treatment. (Moore Dep. at 52-56).

4

Larson's absences. (Moore Dep. at 73). Further, shortly after the assignment change, Larson spent an entire day doing laundry for E&P. (Larson Dep. at 74, 78-79).

Larson worked for a few weeks as a hygiene assistant in various E&P offices, but as a result of the change in Larson's position, E&P required Larson to cross-train for the rover position. (Zweifler Dep. at 18-20). Late in April 2004, E&P released its work schedule for the upcoming week, and assigned Larson to work in its Homewood office beginning April 26. (Pl. St., Ex. J). When Larson discovered that she had been assigned to work in E&P's Homewood office for the week of April 26, she approached Moore to request that she receive training in another office. (Moore Dep. at 87). Moore, however, explained that E&P conducted all training in its Homewood office because that was where its trainer, Leslie Walker, worked. (Moore Dep. at 87). Larson also spoke to Walker about training in a location other than E&P's Homewood office. (Walker Dep. at 51, 69). Despite these attempts to alter the location of her training, Larson testified that she would not have minded training with Walker in Homewood for a period of a few days. (Larson Dep. at 114). In fact, Larson had previously worked in the Homewood office on a regular basis without complaint when she assisted Moore whenever he worked at that office. (Walker Dep. at 34).

However, shortly after Larson's conversation with Walker, Zweifler called Larson, who had been crying about her assignment. (Zweifler Dep. at 22; Larson Dep. at 117). When Zweifler screamed and cursed at her and told her that E&P "is not a country club and [that she] will work where [she is] told," Larson hung up on Zweifler. (Larson Dep. at 86-87)[4]. Zweifler then instructed

---

[4] Of course, Defendant offers a different version of this conversation, but again seems to forget that on a motion for summary judgment the Court is not to make credibility determinations and instead must accept the non-moving party's evidence as true, drawing all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)

Jill Seaman, an office manager, to send Larson home for the day. (Zweifler Dep. at 22; Pl. St., Ex. E, Larson Dep. at 86, 119-120). Seaman informed Larson that if she hung up on Zweifler again, E&P would terminate her. (Larson Dep. at 86).

Sometime later, Larson spoke with Dr. John Pyle, who informed Larson that E&P expected her to attend training at its Homewood office on April 26. (Pyle Dep. at 8-9). But according to Larson, Zweifler called her later that evening at home to inform her that she was terminated. (Pl. St., Ex. B).[5] Because of Zweifler's call, Larson did not work on April 23, even though she was scheduled to work. (Pl. St., Ex. A, J). E&P did not mark Larson's absence on April 23 as unexcused, but instead marked her as terminated on April 22. (Pl. St., Ex. A).

## II. Standard of Review

Summary judgment obviates the need for a trial, but is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56©. The party moving for summary judgment bears the burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts in the record showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir.2000).

---

[5] Defendant moves to strike Larson's affidavit, claiming that it contradicts her deposition testimony. But Defendant has failed to inform the Court precisely how it contradicts her deposition testimony. The Court will not scour Larson's deposition testimony looking for inconsistencies to which the Defendant alludes, and its motion to strike is DENIED.

A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir.2001). In ruling on a motion for summary judgment, however, the court's role is "not to evaluate the weight of the evidence or to determine the truth of the matter," but only to determine whether there is a genuine issue of triable fact. *Outlaw v. Newkirk*, 259 F.3d 833, 836 (7th Cir.2001). Therefore, doubts are resolved in favor of the non-moving party and the court "considers the evidentiary record in the light most favorable to the nonmoving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002).

### III. Analysis

The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-54, makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the Act. 26 U.S.C. § 2615(a)(1); *Kauffman v. Federal Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Among other things, the FMLA guarantees eligible employees 12 weeks unpaid leave per year for various reasons, including a "serious health condition" rendering the employee unable to perform his or her job. 26 U.S.C. § 2612(a)(1)(D). The Seventh Circuit has also construed the FMLA to create a cause of action for retaliation. *Kauffman*, 426 F.3d at 884. Here, Larson argues that E&P both interfered with her attempt to exercise leave and retaliated against her for exercising leave.

Larson argues that E&P denied her right to take leave under the FMLA by firing her before she actually became entitled to exercise that right. The Seventh Circuit has noted that a claim for wrongful termination can be brought under "either a discrimination/retaliation or an

7

interference/entitlement theory," though it addressed the issue only in the context of a plaintiff who had already taken leave and not one who was planning to take leave. *Kauffman*, 426 F.3d at 884. The FMLA makes it unlawful to interfere with the attempt to exercise rights under the FMLA, and at least one court has found that firing an employee before she became eligible to take leave under the FMLA violated § 2615(a)(1). *See Sample v. Rend Lake College*, No. 04 C 4161, 2005 WL 2465905, at * 8 (S.D. Ill. Oct. 5, 2005). In *Sample*, the Court held that "it would be absurd to require an employee to notify her employer in advance of future leave if the employer could simply fire the employee in the interim, thereby relieving itself of the duty to afford the employee leave." *Id.* The Court finds this reasoning persuasive. Firing an employee who has given notice of an intent (or even possible intent) to take leave under the FMLA because of a future condition (such as pregnancy or scheduled hospitalization) before that condition arises constitutes an interference with an attempt to exercise rights under the FMLA.

To proceed under the interference/entitlement theory, a plaintiff need only prove that she is entitled to benefits under the FMLA and that the employer denied her entitlements under the Act. *Kauffman*, 425 F3d. At 884-85 (collecting cases). E&P first argues that Larson is not eligible for any entitlement under the FMLA for a variety of reasons, none of which are convincing.

At the outset, E&P argues that Larson was not employed for a sufficient period of time to be protected under the FMLA. Under 29 U.S.C. § 2611(2)(A)(I), an employee must have been employed for 12 months preceding a request for leave. According to E&P's argument, Larson requested medical leave on August 6, 2003, 2 days shy of her 12 month anniversary. E&P bases this argument on a faulty premise — that Larson's entitlement was for leave requested in August 2003. E&P *granted* Larson's August 2003 leave (though under the FMLA it had no obligation to) and

Larson does not suggest that E&P interfered with any right to take leave in August 2003. Instead, Larson claims that E&P interfered with her attempt to take leave to schedule radiation treatment for her thyroid condition — a request she made sometime *after* October 2003, at which point she had become eligible for protection under the FMLA.

E&P next asserts that Larson failed to provide adequate notice to it, and therefore is not eligible for leave under the FMLA. *See* 29 U.S.C. § 2612(e)(2); 29 C.F.R. § 825.303. E&P argues that Larson provided "no notification, much less 30 days," in her request for time off. But this argument is a red-herring. Larson had not yet scheduled any radiation treatment and so could not provide notice as to the exact dates she required leave. Larson merely anticipated taking leave to receive radiation treatment at some point in the future — and gave her employer notice of this possibility. E&P cannot fault Larson for providing notice even further in advance of that which the FMLA requires. E&P also suggests that Larson's notice was faulty because she failed to provide it with "specific and accurate" information regarding her serious health condition. The gist of E&P's argument centers on Larson's misunderstanding of her disease. E&P argues that because Larson told it she suffered from Graves disease when she instead suffered from a MNG, Larson failed to provide it with sufficiently detailed information to alert it that she might require leave under the FMLA. In support, E&P points to *Collins v. NTN-Bower Corp.*, 272 F.3d 1006 (7th Cir. 2001). But in *Collins*, the plaintiff merely informed his employer that he was "sick," noting that such a reference "not only withheld important information from the employer but likely threw it off the scent . . . [and] [c]ertainly it did not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable." *Collins*, 272 F.3d at 1008-09. That is not the case here. Here Larson actually reported a condition that was *more* serious than the condition she actually

9

suffers from. Larson informed E&P that she suffered from Graves disease and she also informed it that she might need 3-6 weeks to undergo radiation treatment. It is well established that an employee is not required to expressly assert rights under the FMLA. *Collins*, 272 F.3d at 1008; 29 C.F.R. § 825.303(b). Instead, an employee provides adequate notice when she states a "qualifying reason for the needed leave." 29 C.F.R. § 825.208(a)(2); 29 C.F.R. § 825.303(b). The onus is then upon the *employer* to seek additional information and to determine whether the leave requested is FMLA-qualifying. *Philllips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 310-311 (7th Cir. 2006); *see also Kauffman*, 426 F.3d at 886 (noting that employer may request certification from the employee's health care provider to determine whether the employee's condition qualifies as a serious health condition); 29 C.F.R. § 825.303(b). Larson gave E&P reason to believe that she might need medical treatment to treat a thyroid condition that would require her to be away from work for three to six weeks, which provides more than sufficient notice to E&P that Larson had a medical condition that might require time-off pursuant to the FMLA. *See* 29 U.S.C. § 2611(11); 29 C.F.R. § 825.114(a)(2)(I). It was E&P's burden to request additional information if the information provided by Larson was not sufficient.

Finally, E&P argues that Larson did not have a "serious health condition." E&P initially suggests that hyperthyroidism is not a "serious health condition" within the meaning of § 2612(a)(1), citing *Price v. City of Fort Wayne*, 117 F.3d 1022 (7th Cir. 1997). But E&P strains the meaning of "serious health condition" well beyond its intended meaning in its argument and twists the holding of *Price* to suit its purposes. *Price* does not stand for E&P's proposition that a plaintiff suffering from hyperthyroidism is not suffering from a "serious health condition" unless that hyperthyroidism is accompanied by other maladies. Instead, *Price* stands for the proposition that if a constellation

of illnesses cause an employee, because of a health condition, miss more than four days of work (whether because of incapacity or treatment), that the multiple conditions constitute a "serious health condition" even if they would not have if considered separately. *Price*, 117 F.3d at 1024-25 (citing 29 C.F.R. § 825.114(a)(2)(I) ("A serious health condition involving continuing treatment by a health care provider includes . . . a period of incapacity . . .of more than three consecutive calendar days . . . ))). If Larson had received radiation treatment for her thyroid condition, she would have been required to miss three weeks of work. That qualifies as a serious health condition under the plain language of the statute.

Next E&P suggests that Larson's actions with regard to her condition demonstrate that she did not have a serious health condition. E&P bases this argument on two facts: 1) that Larson did not know the name of her condition; and 2) that Larson never scheduled the radiation treatment. But the FMLA does not require Larson to be a medical expert and the record contains more than sufficient evidence to demonstrate similarity in symptoms and treatment between Grave's disease and MNG. E&P's suggestion that Larson's failure to schedule the radiation treatment undercuts her claim to have suffered a serious health condition is also without merit. Radiation treatment is one of three *possible* treatments for both Grave's disease and MNG. Even though Larson ultimately may not have elected to pursue this course of treatment does not undermine the severity of her condition. At the time Larson discussed her treatment with E&P, radiation treatment had been an option discussed with her by her endocrinologist. Further, the undisputed facts, when taken in the light most favorable to Larson, suggest that there was a medical reason why the procedure had not been scheduled. Accordingly, the Court holds that Larson has put forth sufficient evidence to show that a reasonable jury could find that she would have been entitled to leave under the FMLA to undergo

radiation treatment to treat her hyperthyroidism. Consequently, a reasonable jury could then find that E&P interfered with her attempt to exercise her rights under the FMLA by terminating her before she could schedule this leave.

However, when an employee alleges that an employer interfered with her rights under the FMLA, the employer may present evidence to demonstrate that the employee would not have been entitled to her position regardless of the use (or attempted use) of the FMLA. *Kohls v. Beverly Enterprises Wisc., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001). In essence, the substantive right granted by the FMLA does not entitle the employee to any right, benefit or position to which the employee would not have been entitled had she not taken the leave. 29 U.S.C. § 2614(a)(3)(B). Accordingly, an employer may fire an employee for poor performance if she would have been fired for such performance or for a reason other than the fact that she took (or attempted to take) leave under the FMLA. *Id.*

E&P argues that it terminated Larson because she refused to attend training in Homewood and thereby abandoned her job. According to E&P, even if Larson had taken FMLA leave to receive radiation treatment, she would not have been entitled to her position because she refused to attend training in Homewood. But there are several problems with E&P's argument. First, it bases the argument on facts that are in dispute. E&P points to testimony from its witnesses that Larson stated she refused to train in the Homewood office and that it fired her for job abandonment on April 26. According to Larson, however, she was willing to train in Homewood, but was fired on April 22 before she received the chance to receive such training. E&P suggests that Larson offers only her own testimony in support of her arguments. It is true that Larson offers nothing but her deposition testimony, but E&P also offers nothing other than the deposition testimony to support its position.

Missing entirely from the record is any formal termination memorandum or letter that sets forth either the date or the cause of Larson's termination. Further, there are facts in the record, when viewed in the light most favorable to Larson, that bolster Larson's testimony. For example, E&P's calendar identifies Larson as "terminated" as of April 22, not April 26. Moreover, Zweifler's testimony regarding the date of Larson's termination is far from clear and he repeatedly refused to answer the question as to when E&P considered Larson to have been terminated. (Zweifler Dep. at 38-40). Walker testified that Larson had previously worked in the Homewood office without complaint. (Walker Dep. at 34). Finally, E&P's record-keeping is at best sloppy and at worst appears fabricated. For example, E&P repeatedly refers to Larson's unexcused absences.[6] E&P insists that Larson had 5.5 *unexcused* sick days and 5 *unexcused* personal days in 2004, referring to days marked "S" and "P" on the employee calendar.[7] (Def. St. at ¶ 105-106). But an approved day off to attend a doctor's appointment on November 19, 2003, is also marked with an "S," and Defendant nowhere explains how or why it considered the 2004 "S" & "P" days as unexcused. (Def. St. at ¶ 32; Pl. St., Ex. A). Similarly, Moore testified that Larson was out for 39.5 days between August 2003 and April 2004 and that 28.5 were taken on short notice, with a call in the morning and marked "as either S or P on her employee calendar." (Moore Dep. at 57). But as noted above, Moore's testimony cannot be reconciled with E&P's approval of the November 19 appointment, which was also marked as an "S." Perhaps most troubling is Defendant's use of Exhibit 7. Exhibit

---

[6] E&P makes much of Larson's absences in its summary judgment materials, although never suggests that Larson's absences were a reason for her termination. In that respect, Larson's attendance is not a material fact.

[7] Despite the fact that the attendance calender designates "S" as suspended, "U" as unexcused, and "I" as ill, E&P personnel appear to have used "S" as sick and "P" as personal and makes no designation whatsoever for days that are not excused. (Def. St., Ex. 16).

13

7 purports to be a "summary" of Larson's attendance. (Def. St., Ex. 7). It suggests that the vast majority of Larson's sick days, excluding her leave in August 2003, were "unexcused." (Def. St., Ex. 7). But nothing on Larson's attendance calendar, *see* Pl. St., Ex. A, designates *any* of the sick days as unexcused, and Defendant nowhere offers an explanation of how it compiled this "summary" or how it determined that certain days were unexcused. In short, Defendant's Exhibit 7 appears to be a post-hoc explanation concocted to make the evidence conform to its version of the facts. And Exhibit 7 is not the only post-hoc document contained in Defense exhibits. Defendant also includes documents, purportedly written for Larson's personnel file, several days after her termination about an event that occurred prior to her termination. Given these facts, a reasonable jury could infer that E&P's "refusal to train in Homewood" theory is a post-hoc explanation for Larson's termination.

A second problem with Defendant's argument regarding Larson's refusal to train at its Homewood office is that it wholly ignores Larson's argument that it demoted her because she attempted to use leave under the FMLA. According to Larson, E&P demoted her long before she failed to train at Homewood. Although E&P argues that Larson's assignment to another position was a lateral transfer, Moore testified that he requested that Larson be moved from his chairside position and found it difficult to accommodate Larson's absences, and he wrote a document that suggested that he regarded the change as a demotion. (Pl. St., Ex. D; Moore Dep. at 73, Zweifler Dep. at 58-59). Moreover, the fact that immediately following the assignment, E&P required Larson to do laundry for a day further suggests that it regarded the change as a demotion. The record therefore contains sufficient information to allow a reasonable jury to find that E&P demoted Larson. According to Larson, this demotion occurred shortly after she had spoken to Moore about the potential impact of radiation treatment. (Larson Dep. at 52-53). These facts could lead a reasonable

jury to believe that E&P demoted her and demoted her for the prohibited reason of attempting to exercise her rights under the FMLA.

Turning to Larson's retaliation claim, courts evaluate claims of FMLA retaliation the same way that they evaluate other retaliation claims, such as Title VII or ADA claims. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Therefore, Larson may rely on either the direct or indirect method. *Id.* Larson makes no effort to proceed under the direct method, and instead proceeds under the indirect method. Under this method, Larson must show that after she engaging in protected conduct, she and only she was subjected to an adverse employment action even though she was performing her job in a satisfactory manner. *Id.* If Larson establishes a *prima facie* case of retaliation under the FMLA, E&P must then come forward with a nondiscriminatory reason for its actions. *Id.* If E&P meets this burden, then Larson must demonstrate that E&P's reason is pretextual in order to avoid summary judgment. *Id.*

E&P first argues that Larson cannot establish a *prima facie* case. It repeats its argument that Larson never engaged in protected activity because she never provided the requisite notice as required by the FMLA. But as noted earlier, Larson was not required to invoke the FMLA to engage in a protected activity. *See Collins*, 272 F.3d at 1008; 29 C.F.R. § 825.303(b). She needed only to inform the employer of a serious health condition. She did that — informing Moore that she might need 3-6 weeks of leave to undergo radiation treatment for a thyroid condition. E&P also argues that Larson did not suffer an adverse employment action. But this argument is frivolous. E&P terminated Larson's employment (and as noted above, there is a genuine issue of material fact as to whether it also demoted her).

E&P next argues that Larson cannot show that she and only she suffered the adverse employment action. The crux of E&P's argument is that Larson cannot point to another employee "who was allowed to refuse to work in the Homewood office . . . who was not terminated." (Def. Br. In Support of Summ. J. at 9). But E&P's argument conflates the issue of whether other employees who did not engage in protected activity were subject to adverse actions with the issue of whether Larson was meeting E&P's employment expectations. E&P terminated no other dental assistants at the same time it terminated Larson. Larson need not establish more.

Finally, E&P suggests that Larson was not performing her job in a satisfactory manner. E&P provides a list of behaviors it believes establishes that Larson was not performing her job satisfactorily — pointing to her tardiness, her absences, an alleged argument with a patient, and a disruption in the office. Not once, however, did E&P issue Larson a formal, written reprimand for any of these behaviors, despite having a progressive discipline policy. (Zweifler Dep. at 11-13,17; Moore Dep. at 43). Further, the only performance evaluation Larson ever received from E&P was, in the mind of Moore, "pretty good." While it is true that past positive evaluations, by themselves, are not sufficient to establish an employee is performing satisfactorily, *see, e.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004), when combined with the absence of any formal reprimands given to Larson and when combined with the inconsistencies in E&P's record-keeping noted earlier, a reasonable jury could find that Larson was performing her job satisfactorily. Accordingly, the Court finds that Larson has established a *prima facie* case of retaliation under the FMLA.

E&P argues that it has provided a non-pretextual reason for its action: that it terminated Larson because she failed to show up for work on April 26 to train as a rover. As noted earlier, E&P's reason turns on an issue of fact: whether Larson was terminated on April 22 or whether she

was terminated on April 26. In the absence of any documentary evidence, this issue boils down to a classic he said-she said battle, which is inappropriate for resolution on summary judgment. If a jury believes Larson's testimony that she was terminated on April 22 and not April 26, then E&P's proffered reason for terminating her is a lie. Given the evidence in the record that supports Larson's testimony and undermines E&P's and given the inconsistencies apparent in E&P's explanation of Larson's absences, a reasonable jury could find for Larson. Therefore, summary judgment on Larson's retaliation claim is not appropriate.

The Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

_____7/17/06_____
Dated

_____
Honorable William J. Hibbler
United States District Court